| | |
|---|---|
| State Of Maine<br>Cumberland, ss | Superior Court<br>Civil Action<br>Docket No.: |

Mark Opio,  )
)
    Plaintiff  )
)
v.  )  Docket No.
)
Whole Foods Market  )
Group, Inc. and John  )
Espeseth,  )
)
    Defendants.  )

## Complaint and Demand for Jury Trial and Injunctive Relief Sought

Plaintiff Mark Opio brings this civil rights action against Defendant Whole Foods Market Group, Inc. (Whole Foods) and Defendant John Espeseth (collectively, Defendants).

### Summary of Civil Rights Case for Race Discrimination and Retaliation

1. Mark Opio, who is Black, emigrated from South Sudan to Maine as a refugee at the age of 16. Mr. Opio quickly became proficient in English and worked his way through college to earn a Bachelor's degree in Business Administration from the University of Southern Maine.

2. Mr. Opio worked at Whole Foods in Portland for more than eight years, including over seven years in the Meat Department. Throughout his

employment with Whole Foods, virtually all of the supervisory level employees in the Portland store were white.

3. In February 2019, Mr. Opio applied for a promotion to the position of Associate Team Leader (ATL) in the Meat Department. Whole Foods initially scheduled Mr. Opio for a panel interview according to its standard practice, but two days before the interview, Meat Department Team Leader Mark Espeseth abruptly cancelled it. When Mr. Opio asked why, Mr. Espeseth told Mr. Opio that "You don't know how to read the Store Ops [Operations Manual]," that Mr. Opio had not done enough to "prove" himself to the team and get them to "accept you as one of them," and that there was "more to the job than cutting meat." After denying Mr. Opio the opportunity to even interview for the ATL position, Whole Foods hired a white applicant with only a year-and-a-half of experience at Whole Foods and no relevant educational background.

## Parties

4. Plaintiff Mark Opio is a citizen of the United States and is a resident of Portland, County of Cumberland, Maine.

5. Defendant, Whole Foods, is a corporation doing business in Maine and organized under the laws of the State of Delaware.

2

6. Defendant John Espeseth is a Meat Department Team Leader employed by Whole Foods at the Portland store and is a resident of Portland, County of Cumberland, Maine.

### Jury Trial Demand

7. Plaintiff demands trial by jury on all issues triable by a jury.

### Administrative Exhaustion

8. On September 19, 2019, Mr. Opio filed a complaint of race, color, ancestry and national origin discrimination, and retaliation with the Maine Human Rights Commission.

9. On November 18, 2020, the Maine Human Rights Commission issued a Statement of Finding that there were reasonable grounds to believe that Mr. Opio was discriminated against on the basis of race, color, ancestry, and national origin.

10. On February 16, 2021, the Maine Human Rights Commission issued a failure-of-conciliation letter to Mr. Opio.

11. On February 26, 2021, the U.S. Equal Employment Opportunity Commission issued a Notice of Right to Sue to Mr. Opio.

12. Under 5 M.R.S. § 4622, Mr. Opio has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act.

13. Mr. Opio has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## Factual Allegations

### Mr. Opio Comes to the U.S. as a Refugee from South Sudan.

14. Mr. Opio is a Black man born in South Sudan.

15. At the age of 6, Mr. Opio was forced to flee his home country due to violence and was taken under United Nations protection at a refugee camp in Uganda.

16. Mr. Opio lived in the refugee camp for nearly nine years, from the time he was six until he was about 15. During that time, he worked hard to learn the English language and develop reading and writing skills, in the hopes that he would one day be able to come to the United States.

17. In 2001, at the age of about 15, Mr. Opio was able to come to Maine as a refugee, and he settled in Portland. His cousin William Apire, also a refugee from South Sudan, sponsored Mr. Opio to come to Maine, and Mr. Opio lived with Mr. Apire when he first settled in Maine.

18. Mr. Opio attended and graduated from Portland High School. He then went on to become the first member of his family to attend college. He earned an Associates' Degree from Southern Maine Community College, and

then a Bachelor's Degree in Business Administration and Management from the University of Southern Maine.

### Mr. Opio Works for Whole Foods for over Eight Years.

19. While he was in college, Mr. Opio began working in the Meat Department at Whole Foods in Portland when the store first opened, in 2007.

20. Mr. Opio worked at Whole Foods for over eight years altogether, from 2007 until 2015, and then again from December 2018 through October 2019.

21. Throughout Mr. Opio's employment with Whole Foods, virtually all of the supervisory employees at the Portland store—that is, employees at the ATL level and above—were white.

22. According to data provided by Whole Foods, for at least the two-year period from December 2017 – December 2019, not one of the total 66 supervisory employees (ATL level and above) at the Portland store during this period were Black. During this same period, according to U.S. Census data, Portland, Maine's population was 8.4% Black, and yet the Black population was completely unrepresented in Whole Foods' supervisory workforce. *See* U.S. Census, Portland, Maine population estimates 2019, https://www.census.gov/quickfacts/portlandcitymaine.

23. Throughout Mr. Opio's eight years working at Whole Foods in Portland, the only Black supervisory employee was William Apire, Mr. Opio's cousin. Mr. Apire is also originally from South Sudan.

24. Mr. Apire briefly served as an ATL in the Meat Department but was abruptly fired in 2013 after serving in that position for less than a year.

25. Mr. Apire filed a court complaint against Whole Foods in 2015 alleging race discrimination and retaliation. *See Apire v. Whole Foods Market Group., Inc.*, 2:15-cv-00479-DBH (D. Me. Nov. 20, 2015).

26. As alleged in Mr. Apire's court complaint, as soon as he became a supervisor in the Meat Department, he began to experience severe racial harassment and discrimination by Mr. Espeseth, among others. As alleged in Mr. Apire's court complaint, Mr. Espeseth told Mr. Apire that "he was 'lucky' to live here in Portland," and that "Negros should be cleaning his clothes or picking cotton in the farm, not telling a white man or lady what to do." *Id.* at ¶33. Mr. Espeseth was one of four employees on the shift when Mr. Apire found a toy pig with a string tied around its neck hung from the computer screen at his work station. *Id.* at ¶13.

27. Mr. Apire is Mr. Opio's cousin, and Mr. Opio's coworkers and supervisors at Whole Foods, including Mr. Espeseth, were well-aware of that close familial relationship.

6

28. Mr. Opio's annual performance evaluations consistently rated him as meeting or exceeding expectations. For example, Mr. Opio's most recent job evaluation from his supervisor in the Produce Department, dated April 2019, rated him 4s and 5s out of 5 in all categories, and raved: "Mark has excellent overall knowledge of the store and WFM culture as he was previously a Meat Supervisor"; "Mark is able to work with minimal supervision and is very good about checking in with department leadership daily"; "Mark is extremely productive" and "has been a role model for production"; "Mark always comes to work with an upbeat, positive attitude, and is very serious and motivated to do the best job he possibly can"; and "Mark offers excellent customer service" and "is a role model in these areas."

29. During his more than seven years working in the Meat Department, Mr. Opio worked his way up from a Meat Clerk to an Apprentice Meat Cutter to a Meat Cutter. He served in the Meat Cutter role for about four years, starting in around 2011.

30. The Meat Cutter position is a role with some supervisory duties and is the position directly below Associate Team Leader in the Meat Department. Whole Foods' Job Description for Meat Cutter lists supervisory responsibilities for the position including "Place orders in the absence of the Team Leader and Associate Team Leader" and "Train and mentor other Team Members."

7

31. Mr. Opio's most recent job evaluation from his time as a Meat Cutter rated him as meeting expectations in every category and praised his supervisory skills: "You have proven to leadership that you follow policy, procedures. I['ve] seen improvement in the decisions you make with TM's, you have been proving to be a good supervisor"; "Your knowledge of the department is great, there is not one item in the dept. that I fe[e]l you are not confident in."

32. In 2015, Mr. Opio resigned from Whole Foods on good terms because he needed to relocate to Canada for family reasons.

33. In 2018, Mr. Opio moved back to Maine and returned to work at Whole Foods, this time in the Produce Department.

### Mr. Opio Applies for a Promotion to Meat Department ATL.

34. In February 2019, Mr. Opio learned of an open ATL position in the Meat Department, the Department where he had worked for seven years, including around four years as a Meat Cutter.

35. Mr. Opio was excited about the ATL opportunity and submitted a written application for the position.

36. The ATL position would have come with a significant increase in authority and responsibility, as well as a substantial pay increase of $5/hour or more over Mr. Opio's position in the Produce Department.

37. On February 22, 2019, Mr. Espeseth notified Mr. Opio that he was scheduled for an interview on February 27. Mr. Espeseth told Mr. Opio that he would be scheduled to work in the Meat Department for a few hours the morning of February 25, so he could meet the Team Members in that Department.

38. Mr. Opio did substantial preparation for the interview, including seeking advice from the Store ATL on what points to focus on for the interview, preparing a detailed multi-page "Meat Team ATL Action plan," and doing a preparatory mock interview with the Produce ATL.

39. On the morning of February 25, Mr. Opio worked in the Meat Department for several hours as planned. He felt it went very well; for example, one Team Member asked him, "How long have you been doing this?" and seemed impressed by his knowledge.

40. Later on the morning of February 25, Mr. Espeseth asked for Mr. Opio's suggestions about the Meat Department and Mr. Opio explained several ideas, including ways they could set up the meat case to better maximize profit and ways they could do cross-merchandising with other products throughout the store. For example, Mr. Opio suggested to Mr. Espeseth that, to maximize sales, they could cross-merchandise by putting bacon in the dairy section where eggs and milk are and by having BBQ sauces in the refrigerated area where steaks and ribs are displayed.

41. Mr. Espeseth was dismissive of Mr. Opio's suggestions. Mr. Espeseth then asked if Mr. Opio was familiar with the Store Operations Manual. Mr. Opio explained that he knew of the Manual but had not read it because he did not have access to it; his understanding was that the Operations Manual was accessible only to employees at the ATL level or higher. Mr. Espeseth also asked if Mr. Opio had reached out to any of the Regional Meat Coordinators, including Meat Coordinator Kenny MacInnis, who is based in the Boston area.

42. Mr. MacInnis had been Mr. Opio's Team Leader when he first worked in the Meat Department, during the 2007-2015 period. Mr. MacInnis treated Mr. Opio with disrespect on the basis of his race and national origin on multiple occasions. For example, on one occasion, when Mr. Opio left a note for the employees on the next shift, Mr. MacInnis asked, "Who wrote this note for you?!" implying that he could not read and write English. Mr. Opio told Mr. MacInnis that he had written the note, but Mr. MacInnis refused to believe Mr. Opio.

43. Mr. Opio told Mr. Espeseth that he had not yet contacted the out-of-state Regional Meat Coordinators, as he did not realize that doing so was relevant to his application for a position at the Portland store. However, at Mr. Espeseth's suggestion, Mr. Opio confirmed that he would contact the Regional Meat Coordinators before his interview two days later.

## Whole Foods Denies Mr. Opio the Chance to Even Interview for the Promotion.

44.     Whole Foods standard policy and practice is to conduct panel interviews of applicants for open positions. Whole Foods's Hiring and Promotions policy states: "We believe that no one is better at selecting candidates for open positions than our current Team Members . . . Generally, for any leadership position, applicants are interviewed by a panel of peers and other leadership, including Team Member representatives (when appropriate)."

45.     Under Whole Foods's policies, the interview panel consists of a group of Whole Foods employees (both management- and non-management-level) who have expressed interest in sitting on an interview panel. The interview panel makes a recommendation to the Store Team Leader and the Department Team Leader about their preferred candidate.

46.     At around 2:30 p.m. on February 25, toward the end of Mr. Opio's shift, Mr. Espeseth asked to meet with him again. Mr. Espeseth told Mr. Opio that he had decided to cancel Mr. Opio's interview for the ATL position.

47.     When Mr. Opio asked why, Mr. Espeseth said, "You don't know how to read the Store Ops [Operations Manual]," implying that he could not read English.

48. On March 4, 2019, Mr. Opio asked to meet with Assistant Store Team Leader Jason Shaw and Mr. Espeseth to discuss why his interview had been cancelled. Mr. Shaw and Mr. Espeseth explained the interview cancellation in various ways. They said, among other things, that (1) Mr. Opio had not done enough in terms of "earning the trust of the team," having the team "accept you as one of them," and "proving yourself to them"; (2) there was "more to the job than cutting meat"; (3) Mr. Opio did not have anything "useful to say" regarding suggestions for the Meat Department; (4) Mr. Opio was "way too confident" during his February 25 visit to the Meat Department, and (5) Mr. Opio had not yet contacted the Regional Meat Coordinators as of February 25.

49. On March 7, Mr. Opio met with Erin Marshall in Human Resources to report his concerns about the sudden cancellation of his interview. He told Ms. Marshall that he felt his rights to equal opportunity had been violated.

50. Ms. Marshall responded that Mr. Espeseth had acted inappropriately and that she would investigate and get back to Mr. Opio.

51. Mr. Opio never heard back from Ms. Marshall or anyone else in Human Resources in response to his March 7 complaint.

52. After Mr. Espeseth cancelled Mr. Opio's interview, Whole Foods hired JK for the ATL position in the Meat Department. JK is white.

53. JK was the only other applicant for the February 2019 ATL position, so by denying Mr. Opio the chance to interview for the position, Mr. Espeseth guaranteed that it would go to the white applicant, JK.

54. Whole Foods's Hiring and Promotions policy lists "knowledge of our culture and business" as a relevant factor for promotion.

55. At the time of his application, Mr. Opio had worked for Whole Foods for over eight years total, including seven years in the Meat Department. For about four of those years, he was a Meat Cutter, supervising Apprentice Meat Cutters like JK. As documented in his spring 2019 performance evaluation from his Produce Department supervisor, Mr. Opio "has excellent overall knowledge of the store and WFM culture as he was previously a Meat Supervisor."

56. At the time of his application, JK had worked at Whole Foods for just one year and eight months total, all of that time as an Apprentice Meat Cutter.

57. Whole Foods's Hiring and Promotions policy lists "applicable background in the field of interest" as a relevant factor for promotion. The ATL job description lists multiple "job responsibilities" for which a background in business is relevant, including "product merchandising," "sales purchasing and labor targets," "annual sales and expense projections," and "budget preparation."

13

58. At the time of his application, Mr. Opio had significant training and background in business, including a Bachelor's Degree in Business Management from the University of Southern Maine and relevant work experience owning and managing his own tax service business and providing tax services to business and individuals.

59. At the time of his application, JK had no education or background in store or business management. Instead, his application listed prior jobs as a personal trainer and campus patrol officer and short-term positions (all two years or less) as a butcher. Even combined, JK's experience as an Apprentice Meat Cutter at Whole Foods and as a butcher in past jobs was much less than Mr. Opio's over seven years of experience in the Whole Foods Meat Department.

60. Whole Foods's Hiring and Promotions policy lists "current job performance" as a relevant factor for promotion.

61. Mr. Opio's current job performance was excellent, as documented by his 2019 evaluation rating him 4s and 5s out of 5 in all categories.

62. Whole Foods's Hiring and Promotions policy lists "self-motivation" as a relevant factor for promotion.

63. As documented in his 2019 performance evaluation, Mr. Opio "is able to work with minimal supervision," "is extremely productive," and "is very serious and motivated to do the best job he possibly can.

14

64. Throughout his eight years at Whole Foods, Mr. Opio is not aware of any other employee other than JK being promoted directly from a Meat Cutter Apprentice to an ATL.

65. On September 26, 2019, Mr. Opio resigned from his employment effective two weeks later. He left Whole Foods to seek employment where he would have a fair chance to move up in the company and earn recognition for his hard work and education. Mr. Opio would not have left Whole Foods if he had received the promotion to ATL.

## Count I

### Legal Claims for Race, Color, Ancestry, and National origin Discrimination and Related Retaliation

66. Plaintiff realleges and incorporates by reference all the preceding allegations.

67. Defendants Whole Foods and John Espeseth intentionally discriminated against Mr. Opio because of his race, color, ancestry, and national origin and retaliated against him based on his close family member's complaint of race discrimination, in violation of 42 U.S.C. § 1981.

68. Defendant Whole Foods intentionally discriminated against Mr. Opio because of his race, color, ancestry, and national origin, and retaliated against him based on his close family member's complaint of race

discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* and the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634.

69. Mr. Opio is pursuing all possible methods of proving this discrimination, including but not limited to, circumstantial and direct evidence, pretext evidence, as well as causation based on a single unlawful motive and mixed motives, including an unlawful motive.

70. As a direct and proximate result of Defendants' intentional discrimination, Mr. Opio has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of his job and of his life, injury to reputation, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

71. Wherefore, Mr. Opio requests relief against Defendants as follows:

   a. Declare that Defendants violated Mr. Opio's statutory civil rights to be free from race, ancestry, color, and national origin discrimination and retaliation;

   b. Enter injunctive relief ordering Defendant Espeseth to complete effective civil rights training on the requirements of all applicable

laws prohibiting employment discrimination because of race, ancestry, color, and national origin and retaliation within 60 days of the entry of Judgment for Injunctive Relief, and every two years after the date of the entry of judgment;

c. Enter injunctive relief ordering Defendant Whole Foods to:

- Provide effective civil rights training for all Human Resources employees and all supervisors on the requirements of all applicable laws prohibiting employment discrimination because of race, ancestry, color, and national origin and retaliation, and complete this training within 60 days of the entry of Judgment for Injunctive Relief;
- Provide this training for two years after the date judgment is entered to all new Human Resources and supervisory employees within 60 days of their starting the position;
- Maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;
- Post at each of its worksites a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief;

- Send a letter printed on Defendant Whole Foods's letterhead and signed by the Defendant's Chief Executive Officer to all of Defendant Whole Foods's employees advising them of the judgment in this case, enclosing a copy of their policies prohibiting race, color, ancestry, and national origin discrimination and retaliation, and stating that they will not tolerate any such discrimination, and will take appropriate disciplinary action against any employee or agent of Defendant who engages in such discrimination;

d. Award Mr. Opio back pay for lost wages and benefits and prejudgment interest thereon and instatement to the position of Associate Team Leader, or in lieu thereof, front pay for future lost wages and benefits;

e. Award compensatory damages in amounts to be determined at trial by the jury;

f. Award punitive damages in amounts to be determined at trial by the jury;

g. Award Mr. Opio full expenses and reasonable attorney's fees;

h. Award Mr. Opio prejudgment interest; and

i. Award such further relief as is deemed appropriate.

Date: May 10, 2021						Respectfully submitted,


							_____
							Carol J. Garvan, Bar No. 4448
							Johnson, Webbert & Garvan, LLP
							160 Capitol Street, PO Box 79
							Augusta, Maine 04332-0079
							(207) 623-5110
							cgarvan@work.law


							_____
							Shelby H. Leighton, Bar No. 6228
							Johnson, Webbert & Garvan, LLP
							160 Capitol Street, PO Box 79
							Augusta, Maine 0433-0079
							(207) 623-5110
							sleighton@work.law